UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **ALEXANDER STROSS** | |
| Plaintiff, | CIVIL ACTION # 15-CV-223 |
| vs. | |
| **REDFIN CORPORATION,** | JURY DEMANDED |
| Defendant | |

## PLAINTIFF'S ORIGINAL COMPLAINT

PLAINTIFF, Alexander Stross, by and through his undersigned attorneys, respectfully alleges as follows for his Original Complaint against Defendant, Redfin Corporation:

1. Plaintiff Alexander Stross ("Plaintiff" or "Stross") is an individual residing in Austin, Texas.

2. Defendant Redfin Corporation ("Defendant" or "Redfin") is a Delaware corporation with its principal place of business at 2025 1st Avenue, Suite 500, Seattle, Washington 98121; with Texas offices at 5307 East Mockingbird Lane, Suite 500, Dallas, Texas 75206, 2525 Robinhood Street, Suite 214, Houston, Texas 77005, and 4711 Fort Moultrie, Austin, Texas 78754. According to records filed with the Washington Secretary of State, Defendant may be served with process through its registered agent, National Registered Agents, Inc., at 1999 Bryan St., Ste. 900, Dallas, Texas 75201-3136.

### NATURE OF THE CLAIMS

3. This is an action for copyright infringement, contributory copyright infringement and violations of the Digital Millennium Copyright Act ("DMCA"), arising

1

in connection with the unauthorized commercial use of over 1,800 of Plaintiff's architectural photographs.

## JURISDICTION AND VENUE

4. This action arises under 17 U.S.C. §§101 *et seq.* (the U.S. Copyright Act). The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question) and 1338(a) (copyrights).

5. This Court has personal jurisdiction over Defendant because, among other things, Defendant has several offices in Texas, Defendant has done and is doing business in Texas under a license issued by the Texas Real Estate Commission, and because Defendant has committed, and continues to commit, infringing and other illegal acts inside and outside the state of Texas which have had, and are having, an effect within the State of Texas.

6. Venue is proper in this District under 28 U.S.C. §§1391(b), (c) & (d), and 28 U.S.C. § 1400(a).

## CONDITIONS PRECEDENT

7. All conditions precedent have been performed or have occurred.

## INTRODUCTION

8. This case reflects the unfortunate and widespread practice of copyright infringement in the real estate industry, which has become an epidemic in recent years and must be curtailed. In much the same way that online portals such as Napster, Grokster and Pirate Bay leveraged copyrighted content in order to build their illegitimate businesses, real estate companies such as Redfin are now routinely leveraging copyrighted real estate photographs to attract customers and build their businesses, and

are often doing so without the authorization of the copyright owners. As discussed in a recent legal blog:

> Real estate is more and more an Internet-driven business. And what sells on the Internet? Images. Unlike the old days when agents collected home listings in big binders bulging with paper, today it's all about how a home shows online. And that leads to copyright infringement of photos and videos of residences for sale or lease.[1]

The situation is all the worse in Texas - a so-called "non-disclosure" state, where home sales information is generally unavailable to the public, thereby providing consumers with an expectation of privacy. In blatant disregard of those expectations (and the rules of virtually every multiple listing service ("MLS") in the state of Texas), companies like Redfin have created massive, publicly-accessible databases of information related to sold properties - including photographs, sales prices, and other protected data - all in an effort to drive business to their websites, and increase corporate profits. Consumers have few tools with which to fight these behemoths,[2] but Plaintiff stands in a different position. Armed with more than 1,800 copyright-protected works, and evidence that each of them has been infringed by Defendant, Plaintiff is statutorily authorized to seek redress in federal court, and does so today.

## BACKGROUND FACTS

**A.    THE PARTIES**

9.    Plaintiff Alexander Stross is a highly regarded architectural photographer who has worked with some of the most respected names in Central Texas real estate, including Dick Clark Architecture, Wilson Goldrick Realtors, Gottesman Residential,

---

[1] Joel Brothman, *The Copyright Infringement Epidemic in Real Estate*, Law.com, March 8, 2014, http://www.law.com/sites/joelbrothman/2014/03/08/the-copyright-infringement-epidemic-in-real-estate-listings/#ixzz3TXNJG27a.

[2] There is no statutory cause of action in Texas for disclosure of information related to home sales.

John Luce Builder, and Fleetwood USA. Licensed uses of his works have appeared in publications such as *Luxury Home Magazine, Luxe*, *Refine* and *New Home Guide*; as well as appearing on billboards, online advertising, and the like. In addition, Plaintiff regularly licenses his works to real estate agents/brokers for use in marketing their real estate listings. Plaintiff is also a builder and licensed real estate broker, and often photographs his own real estate listings for marketing purposes.

10. Defendant Redfin is an online real estate brokerage company with approximately 38 U.S. offices, and affiliate relationships with numerous third-party brokerage companies, referred to as "Partner Agents."[3] The Redfin business model relies heavily on Internet marketing through its website Redfin.com ("Website"),[4] its mobile applications ("Mobile Apps"), and social media platforms, such as Pinterest and Facebook. A central feature of Defendant's Website is its search engine, which compiles and publishes information from MLS listings across the country ("MLS Search Engine").

### B. REDFIN'S MLS "SEARCH ENGINE"

11. Defendant's MLS Search Engine displays data for both active and previously sold homes, and includes multiple photographs of each listing. Defendant claims that its website displays more "sold" listings than any of its competitors, including, "as many photos as we can."[5] The Redfin Website advises prospective buyers and sellers to research sold listings in order to inform buying/selling decisions, and with the MLS Search Engine, provides them with the tools do to so.

---

[3] https://www.redfin.com/real-estate-agents.

[4] https://www.redfin.com/why-redfin - claiming that its website has helped more than 10,000 customers buy or sell homes each year.

[5] https://support.redfin.com/entries/22538156-Search-for-Sold-Homes.

12.     Defendant uses the MLS search engine to attract prospective homebuyers and sellers - commonly referred to as "leads" - which are cultivated by Defendant's local agents.  Thus, the importance of photography, and the rich visual imagery that it contains.  A recent Wall Street Journal article reported that home buyers spend 60% of their time reviewing photographs of listings,[6] causing them to invest more time and become more involved in the search process.  Defendant also acknowledge that photographs are the primary driver of consumer interest in real estate listings,[7] which is no doubt the reason that Redfin displays "as many photographs as [it] can."  The problem is, Defendant is not paying for the use of photographs that it acquires through the Austin/Central Texas MLS (or any other MLS for that matter); and with respect to "sold" properties, has no right to publicly display the photographs within its sold homes database.

C.     **THE AUSTIN/CENTRAL TEXAS MLS, AND MLS RULES**

13.     Redfin obtains MLS information for the Austin/Central Texas region from Austin/Central Texas Realty Information Service ("ACTRIS"), a wholly-owned subsidiary of the Austin Board of Realtors ("ABOR").  In addition to operating the Austin/Central Texas MLS, ACTRIS promulgates the rules and regulations for its use (the "ACTRIS Rules").  Each ABOR member who wishes to gain access to the Austin/Central Texas MLS, must, among other things, submit an "Applicant Agreement" to ACTRIS.  The ACTRIS Rules are incorporated into the Applicant Agreement, forming a "binding legal agreement between ACTRIS and [the member]."[8]  Qualified members

---

[6] Sanette Tanaka, *20 Seconds for Love at First Sight*, Wall Street Journal, March 21, 2013, http://www.wsj.com/articles/SB10001424127887324077704578360750949646798.

[7] https://www.redfin.com/blog/2010/09/a_picture_is_worth_a_thousand_dollars_true_or_false.html#.VPjQH_nF87k.

[8] ACTRIS Rules, p.1, Introduction.

5

who have gone through the application process and thereby gained access to the Austin/Central Texas MLS are referred to in the ACTRIS Rules as "Participants."[9]

14. Under the ACTRIS Rules, Participants who tender their listing data into the Austin/Central Texas MLS thereby "license" the data to ACTRIS for use in the MLS in accordance with the ACTRIS Rules.[10] The ACTRIS Rules contain provisions allowing Participants to display MLS data - including photographs - pursuant to certain restrictions and limitations.[11] Thus, by tendering photographs into the MLS as part of a listing, a Participant grants other Participants a limited license to display the photographs, subject to the various restrictions and limitations contained in the ACTRIS Rules.

15. Like most MLS's, ACTRIS allows Participants to display MLS information through two different methods: (1) Internet Data Exchange ("IDX"); and (2) Virtual Office Websites ("VOWs"). These two methods are intended for different purposes, and are each regulated by their own set of rules.

16. The primary purpose of IDX is marketing, and more specifically - lead generation. IDX allows Participants to display MLS data on their websites in order to attract visitors and generate customers. Because the system is "open to the public," it is highly regulated, and only "active" listings may be shown to the public via IDX. Display of "sold" properties is strictly prohibited.[12]

17. VOW's are not intended for lead generation. Instead, they are intended to be used by Participants to service existing clients, and are treated as an extension of brokerage services into cyberspace. As defined by ACTRIS, a VOW is a website (or

---

[9] *Id.*, p. 3, Definition O: "Participants."
[10] *Id.*, § 7.10.
[11] *See, e.g., Id.*, Articles VII, VIII and IX.
[12] *Id.*, §§ 8.1, 8.2, 8.15.

6

features of a website), "through which the Participant is capable of providing real estate brokerage services to consumers with whom the Participant has first established a broker-consumer relationship . . . [and] where the consumer has the opportunity to search [MLS data], <u>subject to the Participant's oversight, supervision, and accountability</u>."[13] ACTRIS allows Participants to make display of both "active" *and* "sold" data via VOW, but strictly limits the display of "sold" data to two specific circumstances: (1) Participants may use sold data "to support an estimate of value on a particular property for a particular client" (commonly referred to as "comps"), and (2) the listing Participant of a property may use "sold" data for that property in advertising [that particular listing agent's] services (i.e., a Participant can advertise his or her *own* prior sales).[14] The ACTRIS Rules make it abundantly clear that any other use of sold data is specifically prohibited:

> Any other use of "sold" information, including, without limitation, importation of such information into a separate database or compilation, is unauthorized and prohibited by these Rules.[15]

18.     The ACTRIS Rules also limit the number of sold listings that a Participant may display via VOW "to not more than 100 sold listings in response to any inquiry." *Id*., § 9.24.

19.     Finally, ACTRIS specifically prohibits Participants from (1) commercially exploiting, directly or indirectly, any content from MLS listings, or (2) recommercializing, or receiving anything of value for the utilization, transmission, retransmission, or repackaging in any format, of any information obtained directly or indirectly from the MLS. *Id*., §§ 7.2, 7.6. In other words, MLS data (including

---

[13] *Id*. § 9.1 (emphasis added).
[14] *Id*., § 7.3.
[15] *Id*.

7

photographs) is to be used via VOW solely for the purpose of providing bona-fide real estate services to existing clients.

### D. DEFENDANT'S UNAUTHORIZED USE OF STROSS' PHOTOGRAPHS, AND VIOLATION OF THE ACTRIS RULES

20.     As a Participant, Defendant had (and has) direct access to the Austin/Central Texas MLS, and the photographs contained therein.[16] Among the photographs available to Defendant through the Austin/Central Texas MLS were (and are) photographs from Plaintiff's sold listings, and the sold listings of other Participants to whom Plaintiff has licensed his photographs. Had Defendant used Plaintiff's photographs in accordance with the ACTRIS Rules, there might be no issue. But it did not. Instead, Defendant re-purposed and recommercialized the photographs in blatant violation of the ACTRIS Rules - by way of its Website and Mobile Apps.

21.     In or around May of 2013, Plaintiff discovered photographs from several of his previously sold listings on the VOW portion of Defendant's website. The photographs were not difficult to find.

22.     Redfin's MLS Search Engine contains a filter that may be set for "sale records" - with date ranges of 1 week, 1 month, 3 months, 6 months, 1 year, 2 years, 3 years, and its most inclusive setting, "all." By setting the date range for "all," Plaintiff was able to locate virtually all of his listings, and those of his clients - including related photographs.

---

[16] *See* https://www.redfin.com/definition/Multiple-Listing-Service, stating "[s]ince Redfin is a brokerage, our website and mobile apps are powered by the MLS, so you'll get access to the same information as real estate agents, including notifications when new homes hit the market."

23.     Defendant's display of Plaintiff's photographs (and the photographs of hundreds, if not thousands, of similarly situated photographers in Austin, Texas) violates the ACTRIS Rules in several respects.  Specifically:

   a. The photographs are not utilized "to support an estimate of value on a particular property for a particular client."  Rather, they are simply parked on Redfin's website - ready to be viewed by anyone. ACTRIS Rules § 7.03.

   b. The photographs are contained within a separate database maintained by Defendant - specifically, its database of "sold" properties. *Id*.

   c. Although users are required to submit a name and e-mail address in order to access the VOW portion of Defendant's Website, they are subject to no oversight or supervision (i.e., they can search the entire database unimpeded). ACTRIS Rules § 9.1[17]

   d. The number of sold listings displayed is <u>well</u> in excess of 100 (a recent search returned <u>98,200 listings</u> in the Austin area alone, *see* **Exhibit B**). ACTRIS Rules § 9.24.[18]

   e. Defendant commercializes and recommercializes Plaintiff's photographs via VOW by using them in a manner that is not authorized by the ACTRIS Rules (i.e., for marketing purposes, rather than the provision of bona-fide real estate brokerage services to existing clients). ACTRIS Rules §§ 7.2, 7.6.

24.     Inasmuch as Redfin's display of Plaintiff's photographs violates the ACTRIS Rules, it also exceeds the scope of the limited license that Plaintiff granted to Redfin and other Participants when he tendered the photographs into the MLS - thereby constituting copyright infringement on a decidedly massive scale.  To date, at least 1,820 of Stross'

---

[17] The *sine quo non* of VOW is the ability to create broker-consumer relations in the online environment as an <u>alternative</u> to brick-and-mortar operations - <u>with the same level of oversight, supervision and accountability assumed by a brick-and-mortar brokers</u> - a circumstance that is entirely lacking on Redfin's Website.  The corollary for brick-and-mortar operations would be handing over to the consumer the broker's entire file of sold properties for the City of Austin - a practice that would *never* be condoned or tolerated under ACTRIS Rules, or the rules of any other MLS.

[18] In or around late 2014, Defendant apparently began limiting search results to 200 listings-per-inquiry on its Mobile Apps.  However, its Website continues to return virtually unlimited results; and even on the Mobile Apps, a user can keep entering separate inquiries in order to see a virtually limitless number of sold listings.

photographs ("Works") have been infringed in this manner,[19] and it can be rationally surmised that Redfin has infringed copyright in nearly a million other photographs in the Austin, Texas region alone.[20]

### E.  REDFIN'S MOTIVATION FOR INFRINGING COPYRIGHT

25.  Upon information and belief, Defendant's distribution and display of photographs from sold properties is part of a deliberate effort to increase web traffic, lure prospective homebuyers, and monetize intellectual property that does not belong to it. For instance, Defendant's retention and display of photographs from sold properties almost certainly increases its search engine rank position (for both its homepage and its inner-pages) on third party search engines such as Google, thereby driving more consumers to its website.  It is widely acknowledged (even by Defendant) that professional photography is the principal driver of consumer interest in real estate listings, thereby increasing the attraction, functionality and "stickiness"[21] of its MLS Search Engine, and website in general.  In order to attract even more consumer traffic, Defendant allows its users to "share" photographs from sold properties on their own social media pages - each of which contain a link directly *back* to the Redfin website. This increased traffic facilitates leads and referrals for Defendant's agents and Partner Agents, thereby increasing its bottom line.  In summary, Defendant's wholesale infringement of copyrights is no accident; rather, it is an integral part of the Redfin business model.

---

[19] *See* **Exhibit "A."**

[20] If one conservatively assumes that an average of 10 photographs appear with each of the 98,200 sold listings that Redfin returns in a search of "sold" homes in the Austin, Texas area, it suggests that 980,200 photographs are involved.

[21] *See* http://searchsoa.techtarget.com/definition/stickiness ("Stickiness is anything about a Web site that encourages a visitor to stay longer.")

**D.     DEFENDANT'S FALSE COPYRIGHT MANAGEMENT INFORMATION**

26.     In addition to copying and displaying Plaintiff's Works without authorization, Defendant routinely ascribes false credits to each photograph - suggesting that the photographs are "courtesy of Alexander Stross," when clearly they are not.  By all appearances, Defendant utilizes this phony "courtesy credit" in an effort to conceal the fact that it is exploiting federally copyrighted material without the authorization of the copyright owner.  This too is a violation of U.S. Copyright law, which specifically prohibits the use of false information related to the owner or author of a creative work, and/or the terms and conditions of use. 17 U.S.C. § 1202.

27.     Plaintiff now brings this suit for copyright infringement, contributory copyright infringement and violation of 17 U.S.C. § 1202.

### COUNT I: COPYRIGHT INFRINGEMENT

28.     Plaintiff realleges and incorporates herein the foregoing paragraphs.

29.     By its actions alleged above, Defendant has infringed Plaintiff's copyrights in the Works (a total of 1,820 photographs).  Specifically, by aggregating, copying, displaying, distributing and otherwise exploiting Plaintiff's Works on its website and Mobile Apps, Defendant has infringed Plaintiff's exclusive rights set forth in 17 U.S.C. §106.  Defendant's actions constitute willful infringement of Plaintiff's copyrights inasmuch as it knows, or has reason to know, that its use of Plaintiff's Works is unauthorized; and/or because it is acting with reckless disregard of Plaintiff's copyrights.

30.     As a result of the foregoing, Plaintiff is entitled to actual damages, plus Defendant's profits, and/or statutory damages of up to $150,000 per work infringed, plus attorney's fees and costs of court.

## COUNT II
## CONTRIBUTORY COPYRIGHT INFRINGEMENT

31. Plaintiff realleges and incorporates herein the foregoing paragraphs.

32. By its actions alleged above, Defendant has contributorily infringed Plaintiff's copyrights. Defendant has induced, caused and/or materially contributed to infringing conduct by, *inter alia*, utilizing a "share" button which allows and encourages users to re-post Plaintiff's photographs on social media. Defendant's actions constitute willful infringement of Plaintiff's copyrights inasmuch as it knows, or has reason to know, that its use of Plaintiff's Works is unauthorized; and/or because it is acting with reckless disregard of Plaintiff's copyrights.

33. As a result of the foregoing, Plaintiff is entitled to actual damages, plus Defendant's profits, and/or statutory damages of up to $150,000 per work infringed, plus attorney's fees and costs of court.

## COUNT III
## FALSE COPYRIGHT MANAGEMENT INFORMATION

34. Plaintiff realleges and incorporates herein the foregoing paragraphs.

35. By its actions alleged above, Defendant has violated Section 1202 of the Digital Millennium Copyright Act by providing false copyright management information ("CMI") related to Plaintiff's Works. Specifically, Defendant has attributed false "courtesy credits" to Plaintiff, suggesting that it has permission to use Plaintiff's photographs when it does not. Defendant's actions have been committed knowingly, and with the intent to induce, enable, facilitate and/or conceal infringement - particularly in connection with its "share" button, which encourages users to re-post photographs on social media.

36. As a result of the foregoing, Plaintiff is entitled to actual damages plus the profits of Defendant, or in the alternative, statutory damages for each violation[22] in an amount no less than $2,500 and no more than $25,000, plus costs and attorney's fees. 17 U.S.C. §1203(b)(4), (5) & (c).

## INJUNCTIVE RELIEF

37. As a direct and proximate result of the foregoing acts and omissions, Plaintiff has sustained, and will continue to sustain, substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Plaintiff is informed and believes that unless enjoined and restrained by this Court, Defendant will continue to infringe Plaintiff's rights in its copyrighted photographs. For this reason, Plaintiff is entitled to temporary, preliminary, and permanent injunctive relief.

## JURY DEMAND

38. Plaintiff asserts his rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## PRAYER

For the foregoing reasons, Plaintiff requests judgment against Defendant for the following:

A. An order that Defendant and all persons under its direction, control, permission or authority be enjoined and permanently restrained from exploiting the Works;

---

[22] *See Interplan Architects, Inc. v. C.L. Thomas, Inc.,* 4:08-CV-03181, 2010 WL 4366990 (S.D. Tex. Oct. 27, 2010) citing *Goldman v. Healthcare Management Sys., Inc.,* 559 F. Supp. 2d 853, 868 (W.D.Mich. 2008) (each "distribution" of an infringed work constitutes a distinct "violation").

B.	For each Work infringed, an award of actual damages and/or statutory damages under 17 U.S.C. § 504(c);

C.	For each violation of the Digital Millennium Copyright Act, an award of statutory damages under 17 U.S.C. §1203(c);

D.	An award to Plaintiff of his reasonable costs and attorney's fees under 17 U.S.C. §§ 505 and 1203(b)(4) & (5);

E.	Prejudgment and post-judgment interest on any damage award as permitted by law; and

F.	Such other and further relief as the Court may deem just, proper and/or necessary under the circumstances.

Dated this 19th Day of March, 2015

**LAW OFFICE OF BUCK MCKINNEY, PC**


/s/ R. Buck McKinney
R. Buck McKinney
State Bar No. 00784572
2203 E. 5th St.
Austin, Texas 78702
Telephone:  512/236-0150
Fax:  512/444-1879
Email: *mckinney@buckmckinney.com*
ATTORNEY FOR PLAINTIFF ALEXANDER