**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| ALEXANDER STROSS, | |
| Plaintiff, | Case No. 1:15-cv-00223-SS |
| v. | |
| REDFIN CORPORATION, | |
| Defendant/Counterclaimant. | |

**REDFIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I. Introduction ................................................................................................ 1

II. Summary Judgment Standards ................................................................ 2

III. Stross Licensed Every Use By Redfin Of Photographs ......................... 2

    A. Stross Granted Redfin A License To Use Photos "For Any Purpose Consistent With The Facilitation Of The Sale, Lease And Valuation Of Real Property." ............. 3

    B. Redfin's Alleged Uses Of The Photographs Are All For A Licensed Purpose. ............ 4

    C. Austin Agents Mutually Grant One Another This Broad License For Their MLS System To Function. ........................................................... 5

IV. Redfin Has Not Provided False CMI .................................................... 7

    A. Listing Agent Names Are Not Photograph CMI. ........................... 8

    B. If Listing Agent Names Are Photograph CMI, The Information Is Not False. ............ 8

    C. Redfin Had No Knowledge Of False CMI. ................................. 9

    D. Redfin's Accurate Reproduction Of The Listing Agent Name Did Not Intend To Induce, Enable, Facilitate, Or Conceal Infringement. ............... 9

V. Under The DMCA Safe Harbor, Stross Is Not Entitled To Damages ...... 9

    A. Redfin Is An Online Service Provider. ..................................... 12

    B. All Allegedly Infringed Photographs Reside On Redfin Systems At The Direction Of Users. ........................................................ 12

    C. Redfin Had No Knowledge Of Infringement. ............................ 14

    D. Redfin Acted Expeditiously To Remove Access To Allegedly Infringing Stross Photographs .............................................. 15

    E. Redfin Does Not Have The Right Or Ability To Control The Allegedly Infringing Activity and Receives No Direct Financial Benefit. ........... 16

    F. Redfin Adopted And Implemented DMCA Compliant Policies And Does Not Interfere With Standard Technical Measures. ........................ 18

    G. Redfin Designated An Agent For Receipt of Take Down Notices. ........ 19

VI. Conclusion ............................................................................................. 20

# Table of AuthoritiesCases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................ 2

*Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491 (5th Cir. 2012) .................................. 3

*BWP Media USA Inc. v. Clarity Digital Grp., LLC*, No. 14-CV-00467, 2015 WL 1538366 (D. Colo. Mar. 31, 2015) ................................................................................ 13

*Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500 (S.D.N.Y. 2013) ............... 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 2

*CKP, Inc. v. GRS Const. Co.*, 821 P.2d 63 (1991) ....................................................... 19

*Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013) ........... 16, 17, 18

*Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090 (W.D. Wash. 2004) ........... 12, 16, 19

*Disney Enters., Inc. v. Hotfile Corp.*, 2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) .................. 10

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) ................................................... 11

*Faith Assembly v. Titledge of N.Y. Abstract, LLC*, 106 A.D.3d 47 (2013) ................... 19

*Gaines v. Kelly*, 235 S.W.3d 179 (Tex. 2007) ............................................................ 19

*In re Charter Commc'ns, Inc. Subpoena Enf. Matter*, 393 F.3d 771 (8th Cir. 2005) ................... 15

*Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132 (N.D. Cal. 2008) ............... 12, 16, 17

*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007) ................................... 17

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002) ............. 16, 17

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006 (9th Cir. 2013) 10, 11, 13

*Washburn v. Harvey,* 504 F.3d 505 (5th Cir. 2007) ...................................................... 2

*Well Go USA, Inc. v. Unknown Participants*, 2012 WL 4387420 (S.D. Tex. Sept. 25, 2012) ..... 15

*Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724 (S.D.N.Y. 2012) ............. 12

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................ 2

*Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491 (5th Cir. 2012) .................................. 3

*BWP Media USA Inc. v. Clarity Digital Grp., LLC*, No. 14-CV-00467, 2015 WL 1538366 (D. Colo. Mar. 31, 2015) ................................................................................ 13

*Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500 (S.D.N.Y. 2013) ............... 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 2

*CKP, Inc. v. GRS Const. Co.*, 821 P.2d 63 (1991) ....................................................... 19

*Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013) ........... 16, 17, 18

*Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090 (W.D. Wash. 2004) ........... 12, 16, 19

*Disney Enters., Inc. v. Hotfile Corp.*, 2013 WL 6336286 (S.D. Fla. Sept. 20, 2013).................. 10

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) ................................................... 11

*Faith Assembly v. Titledge of N.Y. Abstract, LLC*, 106 A.D.3d 47 (2013).................................. 19

*Gaines v. Kelly*, 235 S.W.3d 179 (Tex. 2007) .............................................................. 19

*In re Charter Commc'ns, Inc. Subpoena Enf. Matter*, 393 F.3d 771 (8th Cir. 2005)................... 15

*Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132 (N.D. Cal. 2008) ................ 12, 16, 17

*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007)........................................... 17

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002)............. 16, 17

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006 (9th Cir. 2013) 10, 11, 13

*Washburn v. Harvey,* 504 F.3d 505 (5th Cir. 2007) ........................................................ 2

*Well Go USA, Inc. v. Unknown Participants*, 2012 WL 4387420 (S.D. Tex. Sept. 25, 2012)..... 15

*Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724 (S.D.N.Y. 2012) .......................... 12

## Statutes

17 U.S.C. § 1202................................................................................................. 9

17 U.S.C. § 512........................................................................................... passim

## Other Authorities

ACTRIS Rules & Regulations ............................................................................ passim

S. Rep. No. 105–190 (1998) .............................................................................. 10

## Rules

Fed. R. Civ. P. 56............................................................................................. 2

## I. INTRODUCTION

Redfin Corporation ("Redfin") operates a real estate brokerage firm, with offices in Houston and Dallas-Fort Worth and a presence in Austin. Redfin has represented more than 1,800 buyers of residential realty in Texas, including close to 500 buyers in the Austin/Central Texas area. Redfin's innovative, customer-focused business model allows it to generally charge less than the decades-old traditional three percent sales commission for representing Texans buying or selling homes. In just three years, Redfin's 1,823 Texas customers have together saved over $4 million[1] compared to working with traditional real estate agents.

To operate its brokerage, Redfin employs and contracts with individual real estate agents. Its Texas offices employ over 50 Texas agents and support staff. Redfin also partners with agents at other brokerages by referring potential buyers and sellers to them. Like Century 21 or other brokerage firms in Austin and around the country, Redfin's agents participate with the other members of the Austin Board of Realtors® to contribute information regarding properties for sale to a Multiple Listing Service, called the Austin/Central Texas Realty Information Service ("ACTRIS"). Like many other Austin brokerages, Redfin also licenses from other agents, through ACTRIS, the right to reproduce listing information, including photographs, so that its potential customers can make informed decisions about buying and selling property.

Every photograph Plaintiff Alexander Stross ("Stross" or "Plaintiff") alleges Redfin infringed, Stross actually licensed to ACTRIS and Redfin, as well as to many other brokerage firms in Austin. Perhaps chagrined by Redfin's successful price and service competition as compared to old-line agents and brokerage firms, *see, e.g.*, Complaint ¶ 25, Stross now asks this Court to claw back from Redfin the license he granted via ACTRIS to the photographs

---

[1] Declaration of Scott Nagel ("Nagel Decl."), ¶ 12.

previously displayed at the URLs identified in Exhibit A to the Complaint (the "Stross Photographs"). Because Stross cannot create a genuine dispute that his license to Redfin encompasses every alleged use of the Stross Photographs, Redfin seeks prompt summary judgment on all Counts of the Complaint.

## II. SUMMARY JUDGMENT STANDARDS

Summary judgment shall be rendered when the pleadings, discovery and disclosure materials on file, and any affidavits show there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.[2] Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). Dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court views all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Washburn v. Harvey,* 504 F.3d 505, 508 (5th Cir. 2007).

## III. STROSS LICENSED EVERY USE BY REDFIN OF PHOTOGRAPHS

Stross and Redfin agree: Redfin reproduced every photograph at issue in the Complaint. They also agree that Stross granted Redfin a license to use the photographs. Compl. ¶ 14, ECF No. 1; Answer ¶¶ 14, 134, ECF No. 15. They even agree where to find the text of that license within the ACTRIS Rules & Regulations (the "ACTRIS Rules"): Section 7.10.[3] Compl. ¶ 14; Answer ¶ 135. At that, the parties' views diverge. Stross, who declines to quote the license in his Complaint, alleges that certain of Redfin's uses, such as displaying photographs of sold listings, violate various other sections of the ACTRIS Rules and therefore exceed the scope of the license

---

[2] All evidence in attached Appendices, Declarations, and Exhibits are incorporated herein for all purposes.

[3] The ACTRIS Rules are Exhibit E to the Declaration of Paul Fleurdelys ("Fleurdelys Decl.").

he granted. *See* Compl. ¶¶ 23-24. He alleges that Redfin's out-of-license uses create direct and secondary copyright infringement liability and cause Redfin's presentation of false copyright management information. *See id.*

Redfin disagrees. Stross granted Redfin a license sufficiently broad to encompass every use of the Stross Photographs alleged in the Complaint, regardless of whether Redfin has violated any valid and enforceable ACTRIS Rules.[4] *See* ACTRIS Rules § 7.10. Redfin's licensed use of copyrighted material is a defense to Stross' allegation of direct infringement, disposing of Count I. With no direct infringement, Redfin has no secondary liability, disposing of Count II. *See Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). Because Stross' false copyright management information ("CMI") claim requires the Court or fact-finder to conclude that Redfin lacked Stross' authorization for the underlying display, the license grant in which Stross authorized the display also disposes of Count III. *See* ACTRIS Rules § 7.10. Stross cannot create a genuine dispute of material fact that every use by Redfin falls within the scope of the broad license he granted. The Court should grant summary judgment to Redfin on all Counts.

### A. Stross Granted Redfin A License To Use Photos "For Any Purpose Consistent With The Facilitation Of The Sale, Lease And Valuation Of Real Property."

Stross granted Redfin an extremely broad license to every one of the Stross Photographs. Quoted in its entirety, it reads:

> 7.10. <u>Warranty and License To ACTRIS</u>. By the act of submission of any Listing Content to ACTRIS or into the MLS Compilation, the Participant and/or Subscriber represents and warrants that he or she owns all right, title and interest in the Listing Content, has obtained necessary consents to comply with these Rules, if any, from any third party to any materials included in such Listing Content, and to grant, and thereby does grant, ACTRIS (and its service providers and licensees) an irrevocable, worldwide, paid-up, royalty-free, right and license to include the Listing Content in the MLS Compilation, any statistical report or

---

[4] Redfin does not, in fact, violate any valid, enforceable ACTRIS Rule. Stross' license grant moots any potential factual dispute on that point.

> comparables, and to use, copy and create derivative works of it and authorize its use, copying and creation of derivative works for any purpose consistent with the facilitation of the sale, lease and valuation of real property or such other use; provided that with respect to such other use, the Participant has not opted-out of such other use after notice of the same.

ACTRIS Rules § 7.10. The Stross Photographs are Listing Content under the ACTRIS Rules. *Id.* at ¶ J. By submitting the Stross Photographs to ACTRIS, Stross, the Participant, "thereby . . . grant[ed] ACTRIS (and its service providers and licensees) an irrevocable, worldwide, paid-up, royalty-free, right and license to include the Listing Content in the MLS Compilation, any statistical report or comparables, and to use, copy and create derivative works of it and authorize its use, copying and creation of derivative works for any purpose consistent with the facilitation of the sale, lease and valuation of real property . . ." *See id.* at § 7.10.

Stross alleges that he granted a different license. Compl. ¶ 14. He believes he granted a license to use the Stross Photographs "in accordance with the ACTRIS Rules,"[5] though that language is not present in the license grant under § 7.10 or anywhere else in the ACTRIS Rules. *See* ACTRIS Rules § 7.10. Stross' actual license grant does not limit a licensee's use in any way, as long as the licensee uses the Stross Photographs for a "purpose consistent with the facilitation of the sale, lease and valuation of real property." *See id.* Any use within the scope of the ACTRIS Rules fits within that broad license, but so, too, do plenty of other uses. Even if Redfin's use exceeded the scope of any valid, enforceable ACTRIS Rule, review of the actual license demonstrates the absence of any genuine issue of fact: every Redfin use fell within Stross' license grant to ACTRIS and Redfin.

### B. Redfin's Alleged Uses Of The Photographs Are All For A Licensed Purpose.

---

[5] Compl. ¶ 14 ("Under the ACTRIS Rules, Participants who tender their listing data into the Austin/Central Texas MLS thereby 'license' the data to ACTRIS for use in the MLS in accordance with the ACTRIS Rules.").

Redfin is a real estate brokerage firm. Compl. ¶ 10; Nagel Decl., ¶ 3. All its revenue comes from consummated sale transactions of real property. Nagel Decl., ¶¶ 9-10. It exists to facilitate the sale and valuation of real property, and its employees work for only that purpose. *Id.* at ¶¶ 8-11. Its online services exist for no other reason. *See id.* There exists no genuine dispute of any material fact that Redfin's use of the Stross Photographs, as alleged in the Complaint, falls within the broad license grant from Stross to use them for that purpose. *See* ACTRIS Rules § 7.10; Nagel Decl., ¶¶ 8-11. Even if Redfin displays or reproduces photos in a manner that violates any valid and enforceable ACTRIS Rule, there exists no genuine issue of material fact that its display of sold properties occurs for a purpose consistent with the facilitation of the sale and valuation of real property. *See* ACTRIS Rules § 7.10; Nagel Decl., ¶ 8. Agents, buyers and sellers use sold properties to estimate the market value of their subject properties. Declaration of Ann Hale Bailey ("Bailey Decl."), ¶ 25. Photographs of sold properties provide an efficient way to preliminarily select "comparable" properties for this valuation process. *Id.*

Stross granted an irrevocable license that covers Redfin's use, and he cannot create a genuine fact issue to the contrary. *See* ACTRIS Rules § 7.10. As such, the Court need not evaluate the lack of factual merit in Stross' reading of the ACTRIS Rules and description of the presentation of sold listings on Redfin's online platforms.

### C. Austin Agents Mutually Grant One Another This Broad License For Their MLS System To Function.

Stross regrets the scope of license he granted when he tendered the Stross Photographs to ACTRIS to enable himself and his colleagues to profit from real estate transactions. He wishes he could claw back the Stross Photographs and restrain their use. He cannot. Tendering photographs to ACTRIS required him to grant the broad license in § 7.10, the same license

granted to him and all other participants by his fellow agents when they submit photographs. Without this broad license, the MLS could not function. Bailey Decl., ¶ 9. If Stross, or any Participant, could limit his license grant to only the scope of any set of ACTRIS rules as they existed at the moment of tendering Listing Content, ACTRIS could never amend its rules without securing a new license from every Participant whose content existed in the MLS – an unrealistic task. *Id.* As a single example, in Austin alone, a total of 56,304 Participants have contributed Listing Content to ACTRIS as of July 8, 2015. Declaration of Dane Brandon ("Brandon Decl."), ¶ 18. Of those, a total of 25,592 no longer appear in ACTRIS' database as Participants and roughly 10,000 of them submitted fewer than 10 listings to ACTRIS. *Id.* at ¶¶ 18-20. This means ACTRIS had limited interaction with these short-term agents even when they were Participants and now has no reasonable ability to even ask for a new license. Bailey Decl., ¶ 9. Because of the scope of the initial license grant from Stross and other Participants, ACTRIS knows that it can safely deliver even years-old content to new licensees such as Redfin, allowing them to work as full Participants in the market. Brandon Decl., ¶¶ 19-20.

If ACTRIS secured no broader a license than that suggested by Stross, it either could never amend its Rules or could not assure brokerages that they could safely engage in any post-amendment use of the MLS data. *See* Bailey Decl., ¶ 9. It would be unable to grant new participants access to old data, a vital, important part of a functioning real estate market for buyers and sellers alike. Bailey Decl., ¶ 25. The broad license that Stross demands of his fellow agents as an MLS Participant, and that he in turn grants to them, maintains the ability of the MLS to function and make periodic changes to its rules. *See id.*

Stross cannot create a genuine dispute of material fact that every use by Redfin falls within the scope of the license he granted to ACTRIS, Redfin, and every other participant in the

Austin/Central Texas MLS. On that basis, the Court should promptly grant summary judgment to Redfin on all Counts of the Complaint.

## IV. REDFIN HAS NOT PROVIDED FALSE CMI

Even if Stross had not granted a broad license to each of the Stross Photographs, Redfin is entitled to summary judgment on Stross' false CMI claim. The information Stross points to is not CMI, and does not refer to any photograph. The information Stross calls photo CMI actually identifies the name of the agent who supplied the listing – the representative of the seller of the home, as shown in this screenshot of one of the listings at issue with the complained-of text circled. *See*



Fleurdelys Decl., ¶¶ 20-22, Ex. F. This information comes to ACTRIS, and thus Redfin, directly from the agent. *Id.* The ACTRIS Rules explicitly required Redfin to display this information. ACTRIS Rules §§ 8.10, 9.23. Stross, himself a licensed real estate agent, knows this. Answer ¶ 105; Stross Answer ¶ 105. Stross alleges that Redfin "routinely ascribes false credits to each photograph – suggesting that the photographs are 'courtesy of Alexander Stross.'" Compl. ¶ 26. The allegation utterly misrepresents the content of Redfin's website, the source and reason for Stross' name appearing on the same URL as a fraction of the photos at issue, and omits reference to the portion of the ACTRIS Rules that both explain the true meaning of the naming credit and create Redfin's affirmative obligation to present it exactly as it appears.

### A. Listing Agent Names Are Not Photograph CMI.

Stross expurgates the text from Redfin's website to attempt to manufacture a controversy. Compl. ¶ 26. He quotes "courtesy of Alexander Stross" where the actual words are "Listing provided courtesy of" followed by the name and brokerage of the listing agent. *Id.*; *see also* Fleurdelys Decl., ¶ 18. And while Stross alleges that "each" of the 1,820 Stross Photographs are "falsely" attributed to him, in fact under half have his name at the URL. Fleurdelys Decl., ¶ 25, Ex. H. That's because Stross listed only 60 of the 120 properties at issue, and took 758 of the 1,820 Stross Photographs of those properties. *Id.* Every other Stross Photograph appears at a URL with a different listing agent's name. *See id.* They do so because of the explicit requirement of the ACTRIS Rules: §§ 8.10 and 9.23 oblige Redfin to credit the listing agent. *Id.* at ¶ 18. This fact alone demonstrates that the name on a listing does not reflect the name of the photographer or have anything at all to do with CMI in MLS photos. *Id.* at ¶¶ 18-22. After all, when Stross took photographs for another agent, *see* Compl. ¶ 9, the listing courtesy on Redfin identifies that agent – not Stross. *See* Fleurdelys Decl., Ex. G. Because Stross alleges that he owns and enforces the copyright in all Stross Photographs, he can create no genuine issue of fact that the ACTRIS-required listing agent attribution has nothing to do with CMI for the photos in the listing.

### B. If Listing Agent Names Are Photograph CMI, The Information Is Not False.

Even if the listing agent name contains information related to the photo's copyright, the information is true. The agent whose name appears on the listing did, in fact, provide the content and is responsible for the listing. *See* Declaration of Jason Aleem ("Aleem Decl."), ¶¶ 4-6. Should a person wish to buy the property, she or her agent would work with that listing agent. If a person who sees the property after it sells wishes to work with the agent – perhaps impressed with the listing – he could contact the agent who tendered the listing to ACTRIS. Stross can

create no genuine issue of material fact that the listing agent information, even if it qualifies as CMI, is not false.

### C. Redfin Had No Knowledge Of False CMI.

If any of the 120 properties identified by Stross include an attribution of an agent who did not actually list the property, Redfin has no way to know that: Redfin receives the ACTRIS feed with the listing agent information already populated and loads the data into Redfin's database without making alterations. Fleurdelys Decl., ¶¶ 20-22; Aleem Decl., ¶¶ 4-6. Redfin uses the listing agent data to populate the "Listing provided courtesy of" field on Redfin's website. *Id.* at ¶¶ 20-21. Because violating 17 U.S.C. § 1202 requires knowledge, and Redfin dutifully and accurately reproduces the exact information it receives from ACTRIS, the Court must find no genuine issue of material fact that Redfin had no required knowledge and is entitled to summary judgment on this basis as well. *See id.* at ¶¶ 20-23.

### D. Redfin's Accurate Reproduction Of The Listing Agent Name Did Not Intend To Induce, Enable, Facilitate, Or Conceal Infringement.

Finally, recovery for false CMI requires demonstrating the party's intent to induce, enable, facilitate, or conceal infringement. 17 U.S.C. § 1202(a). There is no genuine issue of fact that Redfin's identification of the listing agent was a truthful representation of the name of the agent who listed the property, done in compliance with ACTRIS Rules §§ 8.10 and 9.23. *See* Fleurdelys Decl., ¶¶ 18, 20-22. Because there can be no genuine issue of fact that Redfin had no required intent for a violation of 17 U.S.C. § 1202, the Court should grant summary judgment on this basis as well.

## V. UNDER THE DMCA SAFE HARBOR, STROSS IS NOT ENTITLED TO DAMAGES

Even assuming as true Stross' allegations of infringement, Redfin is shielded from monetary or injunctive relief because Redfin satisfies each of the elements of the safe harbor

provision of the Digital Millennium Copyright Act (the "DMCA"), specifically 17 U.S.C.

§ 512(c).[6] Online service providers who meet specific statutory conditions receive a safe harbor

against damages or injunctive relief under the DMCA, even if infringement occurred. 17 U.S.C.

§ 512(c). Congress enacted the DMCA to keep the specter of copyright liability from chilling

innovation that could serve socially beneficial functions. *UMG Recordings, Inc. v. Shelter*

*Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013). By limiting liability, the DMCA

"ensure[s] that the efficiency of the Internet will continue to improve and that the variety and

quality of services on the Internet will continue to expand." *Id.* (quoting S. Rep. No. 105–190, at

8 (1998)). Although an affirmative defense, DMCA safe harbor protection "has often been

construed in favor of service providers, requiring relatively little effort by their operations to

maintain immunity." *Disney Enters., Inc. v. Hotfile Corp.*, No. 11-20427-CIV, 2013 WL

6336286, at *19 (S.D. Fla. Sept. 20, 2013).

Redfin falls squarely within the category of innovative service providers the DMCA safe

harbor seeks to protect. *See UMG*, 718 F.3d at 1014. Redfin and other online brokerages have

changed the face of residential real estate brokerage by empowering individuals to search listing

data that agents upload through regional MLS. *See* Bailey Decl., ¶ 12. Before the advent of the

internet, agents exchanged listing content with other brokerage firms at meetings using hard copy

listing sheets. *Id.* at ¶ 13. As technology advanced, brokerage firms began hosting websites to

provide listing information, including listings from other agents, to the buying and selling public.

*Id.* at ¶¶ 14-15. Enabling sellers to display listing content on a wide variety of websites to be

---

[6] Redfin respectfully requests a ruling on this ground even if the Court grants summary judgment that Stross licensed Redfin's use. As discussed below, this issue is likely to dispose of the case, so that both issues should be presented on appeal. This request is also closely tied to the importance of the issue for Redfin's innovative brokerage model, and its involvement with MLSs around the country. Redfin respectfully seeks to preserve this issue for any appellate review.

viewed by buyers improves the efficiency of the home buying and selling process. *Id.* at ¶ 12. The Department of Justice recognized the value of this efficiency when it filed an antitrust lawsuit against the National Association of Realtors ("NAR")[7] that resulted in a consent decree aimed at protecting creativity and innovation in internet-focused real estate brokerages like Redfin. *See id.* at ¶ 21.

Copyright holders, like Stross, "know precisely what materials they own, and are thus better able to efficiently identify infringing copies than service providers" like Redfin. *See UMG*, 718 F.3d at 1022. Here, as Congress envisioned, Stross was better positioned to identify the alleged infringing photographs than Redfin, whose website currently contains more than 400 million photographs that have been uploaded by agents via MLS, including more than five million photographs from ACTRIS alone. Brandon Decl., ¶ 15. Stross efficiently identified these photographs on Redfin's website in 2013 without difficulty.[8] Instead of following Congress's carefully crafted takedown procedures, Stross waited *two years* before contacting Redfin about the photographs. Declaration of Teresa Miller ("Miller Decl."), ¶ 7; *see also* Compl. ¶ 21. Stross finally notified Redfin of the alleged infringement when he filed this lawsuit and served Redfin with the Complaint in March 2015. Miller Decl., ¶ 7.

Early summary judgment on Redfin's safe harbor protection supports the DMCA's underlying objectives. *See Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004). The DMCA incents service providers to cooperate in removing potentially infringing content by providing "greater certainty . . . concerning their legal exposure for infringements." *See id.*

---

[7] NAR is a trade organization for real estate agents with an oversight relationship with most regional MLSs, including ACTRIS, known as "REALTOR® association owned MLSs."

[8] *See* Compl. ¶ 21 ("In or around May of 2013, Plaintiff discovered photographs from several of his previously sold listings on the VOW portion of Defendant's website. The photographs were not difficult to find.").

(citation omitted). Failing to promptly consider safe harbor motions would needlessly escalate litigation costs by forcing service providers to engage in potentially irrelevant discovery on liability and damages. The unpredictable nature of discovery-related expenses would contravene the DMCA's incentive for procuring service provider cooperation. Resolving Redfin's safe harbor eligibility early will also encourage efficient resolution of this case. *See Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1098 (W.D. Wash. 2004). Once Redfin has established immunity from monetary liability, Stross' claims will "wither on the vine," even if he could successfully establish infringement. *See id.* Removing the possibility of a large monetary award may encourage Stross to explore alternative opportunities for resolution. *See Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1141 (N.D. Cal. 2008) (finding it "appropriate and more efficient" to decide applicability of DMCA safe harbor before considering liability).

### A. Redfin Is An Online Service Provider.

Redfin is a real estate brokerage firm that operates a website and mobile apps that display real estate listings. Compl. ¶ 10. It is therefore an online service provider. *See* 17 U.S.C. § 512(k)(1)(B). "'[S]ervice provider' means a provider of online services or network access, or the operator of facilities therefor." 17 U.S.C. § 512(k)(1)(B). Redfin provides online services that fall within the DMCA's definition, which Congress "intended to encompass a broad set of Internet entities." *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 744 (S.D.N.Y. 2012) *aff'd sub nom. Wolk v. Photobucket.com, Inc.*, 569 F. App'x 51 (2d Cir. 2014).

### B. All Allegedly Infringed Photographs Reside On Redfin Systems At The Direction Of Users.

#### 1. Real Estate Agents Are Redfin "Users" Under The DMCA.

DMCA safe harbor applies to copyright infringement that occurs "by reason of the storage at the direction of a user material that resides on a system or network." 17 U.S.C.

§ 512(c). Though the DMCA does not define "user," at least one court has observed that "'user' describes a person or entity who avails itself of the service provider's system or network to store material." *BWP Media USA Inc. v. Clarity Digital Grp., LLC*, No. 14-CV-00467, 2015 WL 1538366, at *6 (D. Colo. Mar. 31, 2015).

Real estate agents who upload content to ACTRIS or other MLS systems with which Redfin participates are thus Redfin "users" under the DMCA. *See id*. Agents avail themselves of Redfin's services to share listing content for the purpose of facilitating the sale and valuation of real property by submitting content via the MLS to Redfin's website. *See* Brandon Decl., ¶¶ 3-4. Agents submit the content to Redfin and other brokerages using the MLS, which agents created to enable them to display listed properties on every other brokerage firm's websites[9] in order to increase exposure to possible buyers. *See id.*; Bailey Decl., ¶¶ 11-12.

All data Redfin receives through MLSs, including ACTRIS, originates with a real estate agent user. *See* Brandon Decl., ¶ 3. While Redfin employs real estate agents in Austin, no Redfin employee listed any of the properties at issue in the Complaint. Fleurdelys Decl., ¶ 23. Thus, each of the Stross Photographs came to Redfin from a third party real estate agent, including Stross, who submitted photos for listings where he acted as agent. *See* Compl. ¶ 9.

### 2. The Alleged Infringement Occurred By Reason Of The Storage Of Photographs At The Direction Of Agents.

DMCA safe harbor applies to copyright infringement that occurs due to "storage at the direction of a user." 17 U.S.C. § 512(c). Courts have applied this requirement with a broad causal meaning. *See UMG*, 718 F.3d at 1016 (modifying user-submitted videos to facilitate

---

[9] Though agents may "opt-out" of internet display for any given listing that they submit through the MLS, a very small percentage make this election. Bailey Decl., ¶ 16. Sellers and their agents generally want to display their listing content on as many websites as possible in order to drive interest from buyers. *Id.*

public access fell within the definition of "storage at the direction of a user," because the DMCA imposes "no limitation on the service provider's ability to modify user-submitted material to facilitate storage and access"). Similar to the service provider in *UMG Recordings*, Redfin makes automatic modifications to user-submitted listing content to facilitate storage and access. Brandon Decl., ¶¶ 6-9. Redfin scales the photographs that agents provide to a consistent size for storage and reproduction. *Id.* at ¶ 12. While Redfin's algorithms ensure uniform presentation of certain property features, Redfin makes no substantive alterations to source data from agents through ACTRIS. *Id.* at ¶¶ 6-12.

### C. Redfin Had No Knowledge Of Infringement.

Redfin had no knowledge of alleged infringement and no circumstances made the alleged infringement apparent. *See* Brandon Decl., ¶ 6; Miller Decl., ¶ 7. As of July 8, 2015, Redfin displays over 46 million listings containing 407,660,583 photographs from more than 115 MLS feeds; all passed from agents to Redfin via MLS feeds. Brandon Decl., ¶¶ 14-15. From ACTRIS alone, Redfin displays 358,688 listings containing 5,089,507 photographs. *Id.* It does not pre-screen or alter the information. *Id.* at ¶ 6; Fleurdelys Decl., ¶¶ 13-17. Redfin does not investigate whether the MLS feed contains infringing content before it publishes the information on its website and mobile applications. *See* Brandon Decl., ¶ 6; Fleurdelys Decl., ¶¶ 13-17. Redfin, like every other brokerage firm that republishes MLS data on a website, makes periodic automated requests for data from ACTRIS's computers using a computer program. Brandon Decl., ¶¶ 6-9. It receives data in response to those requests. *Id.* It stores the data and faithfully and accurately reproduces the data on its website or mobile app in response to a consumer inquiry. Brandon Decl., ¶¶ 6-9; Fleurdelys Decl., ¶¶ 13-17. As such, there can be no genuine issue of material fact that Redfin had no knowledge of the alleged infringement.

### D. Redfin Acted Expeditiously To Remove Access To Allegedly Infringing Stross Photographs.

17 U.S.C. § 512(c)(1)(C) requires that a service provider, "upon notification of claimed infringement" as described in § 512(c)(3), which outlines the elements of a valid takedown notice, "respond[ ] expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity." Stross did not alert Redfin to the allegedly infringing photographs prior to commencing this action. Miller Decl., ¶ 7. Stross apparently began recording images of "sold" properties on Redfin – the conduct he alleges constitutes infringement – over two years ago. Compl. ¶ 21. Yet, not once in that period did Stross contact Redfin regarding alleged infringement of his purportedly valuable, copyrighted photographs. Miller Decl., ¶ 7. Instead of asking Redfin to cease the allegedly infringing conduct, Stross waited two years, then filed this lawsuit. *See* Compl. ¶ 21; Miller Decl., ¶ 7. Redfin promptly disabled access to the allegedly infringed content upon receipt of the Complaint[10] – the first time any person, anywhere, had ever accused Redfin of copyright infringement. Miller Decl., ¶ 7; Declaration of Jim Speer ("Speer Decl."), ¶ 8; Declaration of Justin Haag ("Haag Decl."), ¶ 14.

"[A] specific purpose of the notification provision is to allow an ISP, after notification, the opportunity to remove or disable access to infringing material and thereby protect itself from liability for copyright infringement." *In re Charter Commc'ns, Inc. Subpoena Enf. Matter*, 393 F.3d 771, 776 (8th Cir. 2005).[11] Redfin, despite inadequate notice, availed itself promptly of this safe harbor. *See Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 536 (S.D.N.Y. 2013); Stenhouse Decl., ¶¶ 4-8.

---

[10] Declaration of David Stenhouse ("Stenhouse Decl."), ¶¶ 4-8.
[11] *See also Well Go USA, Inc. v. Unknown Participants in Filesharing Swarm*, No. 4:12-CV-00963, 2012 WL 4387420, at *3 (S.D. Tex. Sept. 25, 2012).

**E. Redfin Does Not Have The Right Or Ability To Control The Allegedly Infringing Activity and Receives No Direct Financial Benefit.**

A service provider retains its safe harbor unless it (a) has the right and ability to control the infringing activity and (b) receives a financial benefit directly attributable to such activity. 17 U.S.C. § 512(c)(1)(B). "Both elements must be met for the safe harbor to be denied." *Corbis*, 351 F. Supp. 2d at 1109. Redfin falls within the safe harbor because it does not have the right and ability to control infringing activity and it receives no financial benefit from alleged infringement. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1045-46 (9th Cir. 2013) *cert. dismissed*, 134 S. Ct. 624 (2013).

**1. Redfin Does Not Have The Right Or Ability To Control The Allegedly Infringing Activity.**

Under 17 U.S.C. § 512(c)(1)(B), "the pertinent inquiry is not whether [the service provider] has the right and ability to control it[s] *system,* but rather, whether it has the right and ability to control the *infringing activity*." *Io Grp.*, 586 F. Supp. 2d at 1151 (emphasis in original). This requires "something more" than "merely having the general ability to locate infringing material and terminate users' access." *Columbia Pictures*, 710 F.3d at 1045-46. To lose safe harbor protection, service providers must exert "substantial influence" on the activities of users. *Id.* Examples of "substantial influence" include intentional acts constituting inducement of copyright infringement or high levels of control over users. *See Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1173 (C.D. Cal. 2002). In contrast, service providers do not exert "substantial influence" by implementing filtering systems or having the ability to search for potentially infringing content. *Io Grp.*, 586 F. Supp. 2d at 1153.

Redfin cannot exert substantial influence over users because it is barred from altering listing content or excluding listings from its website. Fleurdelys Decl., ¶¶ 13-15. Redfin does not instruct agents on the content of listings and has no control over the images and other material

that agents upload through ACTRIS. *Cf. Perfect 10 v. Cybernet*, 213 F. Supp. 2d at 1173. Redfin may exclude listings from display "based only on objective criteria, including, but not limited to, factors such as geography, price, type of property, cooperative compensation offered by listing broker, and whether the listing broker is a REALTOR®." ACTRIS Rules § 9.18; *see also* Bailey Decl., ¶ 17. Upon receipt of listing data from agents, Redfin may not, for example, exclude listings containing images from Stross. *See* ACTRIS Rules § 9.18; Bailey Decl., ¶ 17. Thus, Redfin's right and ability to control its system does not constitute the right and ability to control allegedly infringing activity. *See Io Grp.*, 586 F. Supp. 2d at 1153.

### 2. Redfin Does Not Receive Any Direct Financial Benefit From Its Website.

Redfin receives no financial benefit from alleged infringement. Nagel Decl., ¶ 9. Service providers have generally been found to receive direct financial benefit from infringing activity in one of two ways: (1) by selling online advertising space, or (2) by collecting online subscription fees. *See Columbia Pictures*, 710 F.3d at 1045-46. The revenue from these acts must have a direct causal relationship to the infringing activity. *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007).

Redfin does not receive a direct financial benefit in either of these ways because it does not receive *any* direct financial benefit from its website. Nagel Decl., ¶ 9. Redfin has zero website revenue, in contrast to every other case considering whether a service provider receives financial benefit from infringing activity. *See* Nagel Decl., ¶ 9; *see also Columbia Pictures*, 710 F.3d at 1045-46. As a brokerage firm, Redfin does not charge subscribers any fee to access its website. Nagel Decl., ¶ 9. In fact, Redfin may not charge registrants for access to its website, according to the DOJ/NAR consent decree. *See* VOW Policy § II(1)(d).[12] Redfin's approach

---

[12] *See* Bailey Decl., Ex. D (DOJ/ NAR consent decree containing VOW Policy).

mimics the practices of traditional "brick-and-mortar" brokerage firms, which do not charge customers to window shop or to work with an agent to search for listed property. Nagel Decl., ¶¶ 9-10; *see* Bailey Decl., ¶ 21. Redfin also does not advertise third party goods or services to generate website revenue. *See Columbia Pictures*, 710 F.3d at 1045-46; Nagel Decl., ¶ 9.

Redfin generates revenue just like every other real estate brokerage firm in the country: its agents collect commissions when they assist customers in the purchase or sale of real property. Nagel Decl., ¶¶ 10-11. Redfin receives broker fees as a percentage of the purchase price when a Redfin agent or partner agent represents the real estate buyer or seller. *Id.*

### F. Redfin Adopted And Implemented DMCA Compliant Policies And Does Not Interfere With Standard Technical Measures.

A service provider reproducing information stored at the direction of a user qualifies for the safe harbor if it adopts, informs, and implements user policies which subject "subscribers and account holders" to termination if the subscriber and account holder repeatedly infringes copyright. 17 U.S.C. § 512(i)(1)(A). Further, the service provider must not interfere with "standard technical measures" developed to allow copyright owners to identify or protect copyrighted works. Redfin meets both requirements. 17 U.S.C. § 512(i)(1)(B).

#### 1. Redfin Adopted And Informed Subscribers Of DMCA-Compliant Policies.

Redfin "subscribers and account holders" are website registrants, individual customers who confirm their bona fide interest in the purchase or sale of property. Fleurdelys Decl., ¶¶ 3-6. Customers who desire to use Redfin's online services to search MLS information must register with Redfin and accept Redfin's Terms of Use. *Id.* Redfin's Terms of Use require registrants to acknowledge the MLS's copyright to listing data and restricts use of that data. *Id.* at ¶ 6, Ex. C. Registrants must also acknowledge that Redfin may terminate an account at any time with or

without notice. *Id.* Redfin may convey its termination policy to subscribers and account holders by requiring acceptance of terms of service. *See Corbis*, 351 F. Supp. 2d at 1101.

### 2. Redfin Has Implemented Its Policy In A Reasonable Manner.

Redfin implements its DMCA take-down policy in a reasonable manner. None of Redfin's designated agents received a take-down notice prior to the Complaint, to which Redfin promptly responded. Miller Decl., ¶ 7; Speer Decl., ¶ 8; Haag Decl., ¶ 14. Stross cannot create a genuine issue of fact concerning Redfin's implementation of its policy. *See* Miller Decl., ¶ 7.

### 3. Redfin Does Not Interfere With Standard Technical Measures.

"'[S]tandard technical measures' means technical measures that are used by copyright owners to identify or protect copyrighted works and (A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process; (B) are available to any person on reasonable and nondiscriminatory terms; and (C) do not impose substantial costs on service providers or substantial burdens on their systems or networks." 17 U.S.C. § 512(i)(2). No such "standard technical measures" exist for real estate information, which comes to Redfin as text or .xml files and JPEGs. Brandon Decl., ¶¶ 7, 12. Redfin does not alter any data it receives, and thus does not interfere with any measures that might exist. Fleurdelys Decl., ¶¶ 13-17. Redfin meets this safe harbor element.

### G. Redfin Designated An Agent For Receipt of Take Down Notices.

"The limitations on liability established in [17 U.S.C. § 512(c)] apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement . . ." *Id.* at § 512(c)(2). Redfin has done so.[13] Redfin provides copyright holders with instructions for lodging complaints regarding copyright infringement. Miller Decl., ¶ 4.

---

[13] *See Gaines v. Kelly*, 235 S.W.3d 179 (Tex. 2007); *CKP, Inc. v. GRS Const. Co.*, 821 P.2d 63, 67 (1991); *Faith Assembly v. Titledge of N.Y. Abstract, LLC*, 106 A.D.3d 47, 58 (2013).

Redfin's Terms of Use contain instructions for lodging complaints regarding copyright infringement with instructions to contact Redfin's designated copyright agent. Fleurdelys Decl., ¶ 6, Ex. C. Redfin provides the address, phone number, and electronic mail address of the agent. Redfin's Terms of Use are contained on Redfin's website in a location accessible to the public. *Id.* Redfin also provided to the United State Copyright Office the name, address, phone number, and electronic mail address of the agents designated to receive notifications of claimed infringement. Miller Decl., ¶ 8; Speer Decl., ¶ 3; Haag Decl., ¶ 3. Not one of those agents has ever received a notice from Stross or anyone else concerning alleged infringement. Miller Decl., ¶ 7; Speer Decl., ¶ 8; Haag Decl., ¶ 14. There is no genuine issue of fact that Redfin designated agents on its website and with the Copyright Office, meeting this safe harbor element as well.

## VI. CONCLUSION

For the foregoing reasons, Redfin respectfully requests that this Court grant this Motion for Summary Judgment of no direct infringement (Count I), no contributory infringement (Count II), and no dissemination of false Copyright Management Information (Count III); that the DMCA Safe Harbor protects Redfin from money damages or injunctive relief; and award Redfin such other and further relief to which it may be justly entitled, including an award of costs and its reasonable attorney's fees as part of those costs pursuant to 17 U.S.C. § 505.

Dated this 16th day of July 2015.

/s/ Joel B. Ard
Joel B. Ard, WSBA No. 40104
Christopher R. Osborn, WSBA No. 13608
Kelly A. Lennox, WSBA No. 39583
FOSTER PEPPER PLLC
1111 Third Avenue, Suite 3400
Seattle, WA 98101
Telephone: (206) 447-4400
Fax: (206) 447-9700
Email: joel.ard@foster.com;
osboc@foster.com; lennk@foster.com
*Attorneys for Defendant/Counterclaimant
Redfin Corporation*

/s/ Bruce C. Morris
Bruce C. Morris
Texas State Bar No. 14469850
Kane Russell Coleman & Logan PC
919 Milam Street, Suite 2200
Houston, TX 77002
Telephone: (713) 425-7400
Fax: (713) 425-7700
Email: bmorris@krcl.com
*Attorneys for Defendant/Counterclaimant
Redfin Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 16, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Robert Buckner McKinney
Law Office of Buck McKinney, PC
P.O. Box 6231
Austin, TX 78762-6231
mckinney@buckmckinney.com
*Attorney for Plaintiff Alexander Stross*

/s/ Joel B. Ard